**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

**vs.** **1:24-CR-16 (MAD)**

**MICHAEL CONNER,**

**Defendant.**

---

**APPEARANCES:** **OF COUNSEL:**

**OFFICE OF THE UNITED STATES ATTORNEY**
100 South Clinton Street
P.O. Box 7198
Syracuse, New York 13261
Attorneys for the United States

**NICHOLAS C.E. WALTER, AUSA**

**CAPEZZA HILL, LLP**
30 South Pearl Street - Suite P-110
Albany, New York 12207
Attorney for Defendant

**BENJAMIN W. HILL, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On April 10, 2025, Defendant Michael Conner was convicted by a jury of twenty-two counts of wire fraud and two counts of failure to file a tax return. *See* Dkt. No. 98. The jury acquitted Defendant on one count of wire fraud and two counts of failure to file a tax return. *See id.* Presently before the Court are Defendant's motions for a judgment of acquittal pursuant to

Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33. *See* Dkt. No. 163.[1] As set forth below, Defendant's motions are denied.

## II. BACKGROUND

Defendant was charged, in a twenty-eight-count Indictment, with twenty-three counts of wire fraud in violation of Title 18, United States Code, Section 1343 and five counts of failure to file a tax return in violation of Title 26, United States Code, Section 7203. *See* Dkt. No. 1. Trial commenced April 1, 2025. *See* Dkt. No. 83. On the first day of trial, Count Twenty-Four, which charged Defendant with failure to file a tax return for gross income exceeding $10,350 in the year 2017, was dismissed upon motion by the Government. *See* Dkt. No. 163-2 at 2:11-17; Dkt. No. 1 at 4-5.[2]

Defendant, a former resident of Virigina, who moved to Warren County, New York in 2017, is an inventor of household products and possessed multiple patents for his inventions with the U.S. Trademark and Patent Office. *See* Dkt. No. 163-2 at 202:4-9, 217:14-218:20, 736:12-13. Defendant's patents include a refrigerator with rotatable shelves, a paint bucket for a ladder ("The Paint Caddy"), and an electric heated knife. *Id.* at 217:14-218:20. From approximately 2008 through 2011, Defendant formed several companies in Virginia, including Conner Creative Solutions LLC, Cutting Solutions LLC, and Refrigerator Parts & Accessories. *Id.* at 216:19-

---

[1] Although he is represented by court-appointed counsel, Defendant has submitted numerous filings, on his own behalf, in support of his counseled motions. *See* Dkt. Nos. 160, 161, 165. The Court has carefully reviewed all of Defendant's submissions and has taken into consideration the arguments presented in his supplemental filings, to the extent such arguments are relevant and merit consideration.

[2] Citations to documents filed on the docket are to the pagination on the heading of each page, generated by CM/ECF, the Court's electronic filing system. Defendant has submitted the full trial transcript at Dkt. No. 163-2. Citations to the trial transcript are also to the pagination generated by CM/ECF and, where necessary, specific line numbers.

217:10. Defendant obtained capital from investors who acquired shares in his entities. *See e.g.*, *id.* at 229:11-230:25.

Beginning in or around 2008 and continuing through 2022, Defendant obtained additional capital from investors in the form of loans. *See id.* at 230:1-25, 238:16-24. Many of the individuals who loaned money to Defendant were investors in one or more of his companies. *See e.g.*, *id.* Defendant promised to repay his investors their initial investment, plus a return on their investment, upon the sale of his patents. *See id.* at 238:2-13. The largest investors during the relevant time period were the victims, Andrew Mayes ("Mayes"), Lynn Baker, and her late-husband William "Bill" Baker (the "Bakers"). *See id.* at 201:17-24.

The victims initiated wire transfers in Virginia, which the Defendant received in the Northern District of New York. *See id.* at 215:24-216:3. At trial, Mayes and Lynn Baker testified that they sent Defendant money in response to requests, typically made via email, where Defendant represented that he needed funds for certain business-related expenses. *See id.* at 240:15-23, 549:3-17. The Government presented overwhelming evidence that, during the relevant time period, Defendant had no source of legitimate income and was enjoying an extravagant lifestyle funded entirely by wires he received from the victims. *See generally id.*

## III. DISCUSSION

### A. Motion for Judgment of Acquittal

Defendant moves for judgment of acquittal on the basis of insufficiency of evidence: (1) of intent to defraud; (2) of a scheme to defraud; (3) that the misrepresentations were material; and (4) of failure to file tax returns as charged in Counts Twenty-Seven and Twenty-Eight. *See* Dkt. No. 163-6 at 5-12.

"A motion for judgment of acquittal under Rule 29 focuses upon the sufficiency of the government's evidence in its case in chief to sustain a conviction." *United States v. Botti*, 722 F. Supp. 2d 207, 209 (D. Conn. 2010), *aff'd*, 711 F.3d 299 (2d Cir. 2013). "Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (citations omitted).

"In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the [G]overnment." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991)). "'A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation omitted). "'[Courts] must view the evidence in the light most favorable to the [G]overnment, crediting every inference that could have been drawn in the [G]overnment's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (citation omitted). A defendant "'faces a heavy burden'"; "[a]s long as the evidence '[would] suffice to convince any rational trier of fact that the crime charged has been proven beyond a reasonable doubt, then the conviction must stand.'" *Id.* (citations omitted).

"In reviewing the evidence on a motion for a judgment of acquittal, the court must be careful not to usurp the role of the jury." *Id.* "'Rule 29[ ] does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn'" therefrom. *Id.* (citation omitted). "Thus, where 'either of the

two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Id.* (citation omitted).

***1. Wire Fraud***

Counts One through Twenty-Three of the Indictment charged Defendant with wire fraud. *See* Dkt. No. 1 at 3-4. The jury convicted Defendant on Counts One through Twenty-Two. *See* Dkt. No. 98. "The elements of wire fraud are: '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme.'" *Jabar*, 19 F.4th at 76 (citation omitted). As the Second Circuit has explained:

> "Essential to a scheme to defraud is fraudulent intent." Fraudulent intent may be inferred "[w]hen the 'necessary result' of the actor's scheme is to injure others." Intent may also be proven "through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." Because an intent to deceive alone is insufficient to sustain a wire fraud conviction, "[m]isrepresentations amounting only to a deceit . . . must be coupled with a contemplated harm to the victim." "Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." Proof of actual injury to the victim is not required because the scheme need not have been successful or completed.

*Id.* at 76-77 (citations and footnotes omitted).

First, Defendant contends that there was insufficient evidence to convict him of wire fraud because the trial record lacked evidence of intent to defraud. *See* Dkt. No. 163-6 at 6-8. The Government argues that there was "an abundance of evidence concerning intent to defraud" presented at trial. *See* Dkt. No. 170 at 5-8.

"A jury can find a defendant acted with fraudulent intent if it finds 'there exists a discrepancy between benefits reasonably anticipated because of the misleading representations

and the actual benefits which the defendant delivered, or intended to deliver.'" *United States v. Runner*, 143 F.4th 146, 158 (2d Cir. 2025) (quoting *Jabar*, 19 F.4th at 77).

Here, the Government introduced evidence as to the representations Defendant made to obtain the wires charged in each count of the Indictment. As the Government carefully summarizes in its opposition brief, evidence was presented concerning each wire fraud count and what representation Defendant made to the victims to obtain the funds: Count One, $7,000 to avoid unspecified fines; Count Two, $2,500 for Internal Revenue Service ("IRS") fees; Count Three, $3,300 for an accountant; Count Four, $6,200 to avoid an IRS audit; Count Five, $7,000 for an accountant and fees acquired for late K-1 filings; Counts Six and Seven, $7,500 to "save the closing"; Count Eight, $7,831.17 to pay an accountant named Kerry; Count Nine, $7,500 as a retainer for another accountant named Paul; Count Ten, $7,500 to pay a "[t]ransfer wire amount"; Count Eleven, $1,500 to pay an attorney; Count Twelve, $7,700 to pay his partners not to "abolish the contracts"; Count Thirteen, $2,300 owed to the bank for overdraft fees; Count Fourteen, another $3,700 to the bank to release funds "in one minute"; Counts Fifteen and Sixteen, $9,500 "to cover a few things with the new companies," and to obtain "paperwork from the attorney, accountant, and the state"; Count Seventeen, $5,830 to cover a minimum account balance; Count Eighteen, $7,500 that "just needs to be [in the account] and taken by the bank"; Counts Nineteen and Twenty-Two, $10,500 for a filing fee for "two papers"; Counts Twenty and Twenty-One, $500 for travel and $3,800 for an IRS fee. Dkt. No. 170 at 6-7 (summarizing testimony related to each count and citing to the record).

The Government also presented testimony from witnesses who described the material falsity of the reasons Defendant provided to the victims to induce them to wire him money. Indeed, an IRS custodian of records testified that Defendant never filed K-1s and did not pay IRS

fees, fines, or penalties after requesting funds for such purposes, and three different accountants from Warren County, including "Kerry" and "Paul" who Defendant referenced by name to the victims, testified that they did not perform the work Defendant claimed. *See* Dkt. No. 163-2 at 489:2-490:14, 783:3-9, 831:1-832:16, 848:6-10. Moreover, the trial proof contained testimony that Defendant made no payments to an accountant or lawyer at the times he requested money for such purposes, that there were no large overdraft fees from banks or minimum account balance issues, and that no "closing" ever occurred. *See, e.g.*, *id.* at 909:4-13, 1498:16-23.

Defendant contends that merely failing to pay back a loan as promised does not constitute wire fraud. Dkt. No. 163-6 at 7-8. However, this argument ignores the fact that the Government introduced evidence of Defendant's use of the "loans" for extravagant personal expenses rather than the business expenses he claimed they would fund. Indeed, Special Agent David Lynch ("Special Agent Lynch") testified in detail regarding how Defendant's expenditures of the funds sent by the victims were inconsistent with the reasons Defendant provided to the victims. For example, as to Count Eight, the victims testified that they believed Defendant needed $7,831.17 to pay "Kerry" the accountant, but Special Agent Lynch testified that Defendant spent at least part of that money at fine dining restaurants and clothing. *See id.* at 899:9-901:13. And, as to Counts Nineteen and Twenty-Two, Defendant told the victims that he needed $10,500 to file "two papers," but, as Special Agent Lynch testified, these funds were spent on fine dining, gambling, and other personal expenditures. *See id.* at 920:1-923:22.

The evidence was more than sufficient for the jury to find fraudulent intent. *See Runner*, 143 F.4th at 158. Defendant has, therefore, failed to meet his heavy burden of demonstrating that no reasonable finder of fact could conclude that he intended to defraud the victims by lying about the intended use of funds wired to him.

Second, Defendant argues that there was insufficient evidence of a scheme to defraud because the Government charged only twenty-three of seventy-seven wires and Defendant was acquitted on Count Twenty-Three. *See* Dkt. No. 163-6 at 8-9. The Court disagrees.

Defendant's trial counsel presented a similar argument; that there could be no scheme because the Government charged only certain wires. *See* Dkt. No. 170 at 8. However, Defendant presents no authority which requires the Government to charge each and every instance of wire fraud to obtain a conviction. *See id.* (citing *United States v. Dupre*, 462 F.3d 131, 143 (2d Cir. 2006)). At trial, the Government presented a wealth of evidence which demonstrated that Defendant caused the victims to wire him specific amounts of money through a coordinated scheme of lies and deception. The jury, after considering the evidence and counsel's arguments, found Defendant guilty of twenty-two counts of wire fraud. The Court will not usurp the jury's function by second-guessing their findings.

Defendant is also incorrect that the twenty-two wire fraud convictions cannot stand because they are inconsistent with an acquittal on Count Twenty-Three. *See* Dkt. No. 163-6 at 8-9. The jury's verdict was not inconsistent; each count charged a distinct wire transfer on a different occasion. *C.f. United States v. Gaind*, 31 F.3d 73, 79 (2d Cir. 1994) (finding verdicts of guilty on one count and not guilty on another not inconsistent because, although both counts involved the same scheme, they related "to two distinct events occurring at distinct times"). The jurors carried out their duties and found that, although the Government proved Defendant's guilt beyond a reasonable doubt on twenty-two counts, the Government had not done so with respect to Count Twenty-Three. Further, even if the verdicts were inconsistent, "it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a

ground for reversal of the verdicts of guilty." *United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) (collecting cases).

Third, Defendant contends that the trial evidence was insufficient to prove that his misrepresentations were material. *See* Dkt. No. 163-6 at 9-12. "In proving the first element of wire fraud (a scheme to defraud), the government must prove that the misrepresentations at issue were material." *United States v. Frenkel*, 682 Fed. Appx. 20, 22 (2d Cir. 2017) (summary order) (citation omitted). A statement is material for purposes of wire fraud "'if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct.'" *United States v. Priolo*, 812 F. Supp. 3d 250, 258 (E.D.N.Y. 2025) (quoting *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017)). As the Government correctly points out, Defendant's arguments concerning the materiality of his misrepresentations hinges on the subjective perception of the victims as they continued to wire Defendant funds over the course of many years. *See* Dkt. No. 170 at 9-10. However, as the jury was correctly instructed, *see* Dkt. No. 96 at 22-23, "the materiality of the misrepresentations was to be assessed from the objective perspective of a reasonable person, rather than from the subjective perspective of the victim." *Frenkel*, 682 Fed. Appx. at 22-23 (finding such jury instruction correct in light of common law definition of materiality for purposes of wire fraud, as explained by the Supreme Court) (citing *Neder v. United States*, 527 U.S. 1, 16 (1999)).

The record here contains overwhelming evidence that Defendant's misrepresentation to the victims would have the tendency to influence a reasonable person to wire the Defendant money on the dates charged in the Indictment. *See* Dkt. No. 170 at 9-10. Viewing this evidence in the light most favorable to the Government and carefully avoiding usurping the role of the jury, as the Court must, the Court finds Defendant has failed to show that he is entitled to a judgment of

acquittal on the basis that no reasonable juror could have concluded that his misrepresentations were material.

***2. Tax Fraud***

Defendant contends that his convictions on Counts Twenty-Seven and Twenty-Eight for failure to file a tax return for the years 2020 and 2021, must be overturned because he was acquitted on Counts Twenty-Five and Twenty-Six (charging him with failure to file a tax return for 2018 and 2019). *See* Dkt. No. 163-6 at 12. However, as with his argument pertaining to his acquittal on Count Twenty-Three, merely because the jury found Defendant guilty of two instances of failure to file a tax return, but acquitted him of two other instances, is not sufficient to warrant a judgment of acquittal as to all counts of failure to file a tax return. *See Acosta*, 17 F.3d at 545 (collecting cases); *see also United States v. Powell*, 469 U.S. 57, 66 (1984) ("We . . . reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake").

**B. Motion for a New Trial**

"On a Federal Rule of Criminal Procedure 33 motion for a new trial, the court may grant the motion 'if the interest of justice so requires.'" *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting Fed. R. Crim. P. 33(a)). "'The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice.'" *Id.* (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). "[M]otions for a new trial are disfavored in [the Second] Circuit," *United States v. Figueroa*, 421 Fed. Appx. 23, 24 (2d Cir. 2011) (summary order) (quoting *United*

*States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995)), and may only be granted in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (citation and internal quotation marks omitted). "To grant the motion, '[t]here must be a real concern that an innocent person may have been convicted.'" *Aguiar*, 737 F.3d at 264 (quoting *Ferguson*, 246 F.3d at 134).

***1. Evidentiary Rulings***

Four of Defendant's new trial arguments are premised on purported errors in this Court's evidentiary rulings: (1) that the Government improperly shifted the burden of proof to Defendant during its examination of Special Agent Lynch; (2) that the Court erred in admitting evidence regarding Defendant's license plate and interactions with a sex worker; (3) that the Court erred in denying Defendant's motion to exclude evidence of certain uncharged conduct; and (4) that the Court erred in permitting the introduction of text messages from Bill Baker's phone during Lynn Baker's testimony. *See* Dkt. No. 163-6 at 13-19.

"Where an evidentiary ruling is the basis of a defendant's Rule 33 motion, the question is not whether there was error in the evidentiary ruling, but whether there is 'manifest injustice' and a real concern that an innocent person may have been convicted." *United States v. Soto*, No. 12-CR-556, 2014 WL 1694880, *5 (S.D.N.Y. Apr. 28, 2014), *aff'd sub nom. United States v. Ramos*, 622 Fed. Appx. 29 (2d Cir. 2015)). Thus, "in the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions." *Id.* at *7. Here, Defendant has not met his onerous burden of demonstrating manifest injustice.

***a. Burden shifting***

First, Defendant argues that the Government improperly shifted the burden during its redirect examination of Special Agent Lynch, when the Government asked, "is it fair to say that if

defense counsel wanted to call Special Agent Swazi as a witness, Special Agent Swazi would show up?" Dkt. No. 163-2 at 1027:6-8; *see* Dkt. No. 163-6 at 14-15.

In its opposition brief, the Government clarifies the context within which this portion the trial testimony arose. *See* Dkt. No. 170 at 11-13. During Special Agent Lynch's cross-examination, defense counsel probed the lack of audio recordings of his interviews with the Bakers. *See* Dkt. No. 163-2 at 979:10-984:25. Then, on redirect, the Government questioned Special Agent Lynch on the same topic. Special Agent Lynch testified on redirect that, although audio was not recorded, a colleague, Special Agent Swazi, had also participated in the interviews. *See id.* at 1026:9-1027:5. At this point, the Government asked whether Defendant could have called Special Agent Swazi. *See id.* at 1027:6-8. The Court sustained defense counsel's objection to this question, before any answer was given, and reminded the jury that "[t]he defense is under no duty to call any witnesses, as I told you." *Id.* at 1027:9-11.

Although "[w]hen the defendant has impugned the integrity of the government's case, the government is entitled to respond," *United States v. Walker*, 835 F.2d 983, 989 (2d Cir. 1987) (citation omitted), the Court sustained Defendant's objection to the Government's question and issued a timely curative instruction. *See* Dkt. No. 163-2 at 1027:9-11.[3] Importantly, Special Agent Lynch never answered the question. And, even if he had answered before an objection was lodged, there is a "strong presumption that the jury" will follow instructions to "disregard stricken testimony[.]" *United States v. Larmore*, No. 25-774, 2026 WL 479514, *3 (2d Cir. Feb. 20,

---

[3] As the Government correctly notes, the Court also instructed the jury regarding the burden proof at the beginning of trial, as well as after summations. *See* Dkt. No. 170 at 12 (citing Dkt. No. 163-2 at 192, 1578); Dkt. No. 163-2 at 1578:12-17 ("[D]efendant has no burden of proof whatsoever in this case. As you heard me say many times, under our Constitution, criminal defendants are under no obligation to call any witnesses. They are presumed innocent and the presumption of innocence continues through the trial and during your deliberations").

2026) (citing *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008)). Indeed, "[w]here an inadmissible statement is followed by a curative instruction, the court must assume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it," absent "an overwhelming probability that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Elfgeeh*, 515 F.3d at 127 (quoting *Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987)) (internal quotation marks omitted).

Defendant offers nothing beyond conclusory allegations to demonstrate that there was an overwhelming probability that the jury disregarded the Court's instruction. Moreover, although the Government did not explicitly state that Defendant had his own burden, even if the Government had, the curative instruction was sufficient to nullify any potential prejudice. *C.f. Walker*, 835 F.2d at 988 ("While it is serious misconduct for the prosecutor to state that the defendant has his own burden of proof, proper instructions by the trial court may suffice to prevent undue prejudice and make the misconduct harmless"). Thus, Defendant has failed to show that he suffered any manifest injustice caused by the Court's curative instruction or the unanswered question asked by the Government.

***b. Evidence of Defendant's license plate and interactions with sex workers***

Defendant also takes issue with the Government's introduction of evidence regarding his vanity license plate "BCK4MOR." Dkt. No. 163-6 at 15-16. Defendant's argument that the brief trial testimony regarding his license plate "effectively forced [him] to testify in his own defense," Dkt. No. 163-3 at 16, is without merit. As the Government points out, Defendant did not testify regarding the license plate during his direct examination. *See* Dkt. No. 170 at 14. And, during his cross-examination by the Government, he offered the explanation that "BCK4MOR" referred to

the New York Yankees coming "[b]ack for more championships." Dkt. No. 163-2 at 1428:21-25. Whether the explanation Defendant volunteered was credible was a question for the jury to decide.

Regardless, Defendant knew this evidence would likely be presented at trial before the trial began. Before trial, Defendant argued in his motion *in limine* that this evidence should be precluded. *See* Dkt. No. 60 at 13. The Court denied this portion of Defendant's pretrial motion, holding that the use of Defendant's license plate as evidence of Defendant's fraudulent intent and his knowledge that the loans from the victims were income which he never intended to repay was relevant and not unduly prejudicial. *See* Dkt. No. 73 at 17-18. Now, Defendant "'seeks to use Rule 33 as a vehicle to relitigate evidentiary rulings with which he disagrees.'" *United States v. Brooke*, No. 1:23-CR-0443, 2026 WL 2268355, *7 (E.D.N.Y. Aug. 6, 2026) (quoting *United States v. Castro*, 669 F. Supp. 2d 288, 293 (E.D.N.Y. 2009)). But, a Rule 33 motion is not the proper vehicle to relitigate pretrial rulings, as "such argument is more properly presented to the appellate court." *Id.* (citing *United States v. Malka*, 623 F. Supp. 3d 306, 328 (S.D.N.Y. 2022)). Evidence of Defendant's vanity license plate was properly admitted and Defendant has not shown that such evidence resulted in any manifest injustice.

Relatedly, Defendant also contends that the Court improperly permitted the Government to present evidence that he patronized sex workers because such "salacious allegations" unduly prejudiced him by inviting the jury to convict "based on irrelevant moral judgments rather than substantive proof." Dkt. No. 163-6 at 16. The Court disagrees.

The Government introduced this evidence during Defendant's cross-examination as evidence of Defendant's use of the money he obtained from the victims for his own personal purposes. As the Government argued in its summation, during Defendant's communications with

the purported sex worker, he explicitly referenced a wire he anticipated receiving from Virginia and use of those funds to purportedly pay for sex:

> [C]onsider his communications with the sex worker that we mentioned. He talks about my wire from Virginia, that he's going to pay her, that he gets big checks in December, and that he's going to see her repeatedly. Again, not shaming anyone for seeing . . . a sex worker. That's not what I'm trying to do, but it's the sort of thing that you would do if it were your money and if you considered it to be your money.

Dkt. No. 163-2 at 1523:6-14.

During the Government's cross-examination of Defendant, outside the presence of the jury, the Court heard argument from counsel on this evidence and ruled that "[i]n light of [Defendant's] direct testimony . . . that the [victims] were okay with anything that [the Defendant] did with the money that [they] gave [him]" the evidence regarding Defendant's communications with a sex worker, wherein he explicitly references bank wires from the victims, was relevant and not unduly prejudicial. *Id.* at 1324:23-1326:24. This evidence was not introduced for purposes of demonstrating Defendant's criminal propensity or character. Instead, this evidence fell well-within the Second Circuit's "inclusionary approach" to Rule 404(b), *United States v. Zhong*, 26 F.4th 536, 551 (2d Cir. 2022) (citation and internal quotation marks omitted), which favors the admission of other acts evidence for purposes such as "'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident[,]'" *id.* (quoting Fed. R. Evid. 404(b)(2)). Alternatively, this evidence was admissible as direct evidence because it showed "the circumstances surrounding the events or . . . furnish[ed] an explanation of the understanding or intent with which certain acts were performed." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997).

Given the limited context within which this evidence was presented, the Court finds Defendant has not shown any manifest injustice caused by the admission of evidence of his patronage of a sex worker which would warrant a new trial.[4]

***c. Uncharged conduct***

Defendant also seeks to relitigate his pretrial motion to exclude evidence of uncharged crimes, including loans made before 2017, as well as uncharged loans from the Bakers, Mr. Mayes, Tammie Braley ("Braley") and Vincent Crocitto ("Crocitto") between 2017 and 2023. *See* Dkt. No. 163-6 at 17-18; Dkt. No. 60 at 8-12. As discussed, the present motion is not the appropriate vehicle to revisit pretrial evidentiary rulings. *See Brooke*, 2026 WL 2268355, at *7.

Regardless, the Court's pretrial ruling was proper. *See* Dkt. No. 73 at 6, 9, 13-15. Defendant is incorrect now (just as when he raised nearly identical arguments pretrial) that the uncharged conduct evidence was inadmissible because, *inter alia*, it involved "'different parties and different types of transactions.'" *See* Dkt. No. 163-6 at 17 (quoting *United States v. Kurland*, 20-CR-306, 2022 WL 2669897, *5 (E.D.N.Y. July 11, 2022)); Dkt. No. 60 at 9-16.[5]

As to the evidence concerning pre-2017 transactions with the Bakers and Mr. Mayes, this Court was correct in finding that such evidence was admissible as "background evidence necessary to understand the parties' relationship" and also "to complete the story of the crime on trial." Dkt. No. 73 at 9 (citing *United States v. Lyle*, 856 F.3d 191, 206 (2d Cir. 2017); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); and *Gonzalez*, 110 F.3d at 941-42). As to the

[4] Also worth mentioning is that Defendant was found not guilty on the count charging him with wire fraud for the December 2021 wire. *See* Dkt. No. 98 at 7. It could hardly be said that evidence pertaining to a count for which Defendant was acquitted caused manifest injustice.

[5] The Court provided a thorough recitation of the relevant law in its Memorandum-Decision and Order issued March 24, 2025. *See* Dkt. No. 73 at 6-9.

uncharged conduct concerning loans from the Bakers and Mayes between 2017 and 2021, this Court was correct in finding that such transactions were "intrinsic to the charged scheme, because uncharged and charged transactions were all part of the same 'series of transactions'—a series of requests by which Defendant continually asked Baker and Mayes for loans, and Baker and Mayes sent him money, believing that the money would help him sell the patents." *Id.* at 11.

And, as to Braley and Crocitto, this Court correctly determined that such uncharged transactions were direct evidence of Count Twnty-Seven or, alternatively, admissible under Rule 404(b) as evidence of Defendant's intent, scheme, and plan to commit fraud with respect to the wire fraud counts. *See id.* at 13-16. The Court also properly analyzed the probative value and potential prejudice of the proposed testimony of Braley and Crocitto, finding Rule 403 did not preclude it. *See id.* Further, testimony regarding the uncharged loan to Crocitto was necessary to explain a highly relevant text message sent by Defendant to Crocitto: that for "14 years" Defendant had been "living on" his "investors." *Id.* at 15-16. Such evidence, this Court observed, was "relevant to both Defendant's fraudulent intent, because at the time Baker and Mayes were loaning him money for specific business expenses, not 'paying' him, and also to Defendant's knowledge that the money he received from them was income (*i.e.*, loans he never intended to repay), which he willfully failed to report on his tax returns." *Id.* at 16. "In order to explain this text message exchange, Crocitto would have to explain that he loaned Defendant money and was seeking repayment; otherwise, the text messages would not make sense to the jury." *Id.*

Thus, the Court finds that Defendant has not demonstrated manifest injustice stemming from this Court's pretrial evidentiary rulings regarding uncharged transactions.

***d. Bill Baker's text messages***

Defendant next contends that this Court erred in permitting the Government to introduce text messages, over defense counsel's objections, from deceased victim Bill Baker's cell phone during Lynn Baker's testimony. *See* Dkt. No. 163-6 at 18-19. According to Defendant, this evidence lacked authentication, violated the rule against hearsay, and violated the Confrontation Clause. *See id.* The Court disagrees.

The text message evidence was properly authenticated. Lynn Baker testified that, although the messages were sent from her late-husband's cell phone, she typed all of them. *See* Dkt. No 163-2 at 550:9-552:15, 567:4-7, 570:24-571:1. As such, the Court agrees with the Government that such testimony satisfies Rule 901, as the Government "produced 'evidence sufficient to support a finding' that the messages were what the [G]overnment claimed them to be, *i.e.*, messages typed by Lynn Baker on Bill Baker's phone." Dkt. No. 170 at 17 (quoting Fed R. Evid. 901). Moreover, Defendant's argument that Lynn Baker was "not privy to every one of her husband's conversations with [Defendant,]" Dkt. No. 163-6 at 18-19, is beside the point. Lynn Baker testified that she did not listen to every single verbal conversation between Bill Baker and Defendant, but she unequivocally testified that she personally typed the relevant text messages. *See* Dkt. No. 163-2 at 680:17-681:9; *see also* Dkt. No 163-2 at 550:9-552:15, 567:4-7, 570:24-571:1.

Nor was this evidence hearsay because the Government offered the text messages for their effect on Lynn Bakers' state of mind, not for their truth. *See* Dkt. No. 163-2 at 569:5-11, 571:13-18. Additionally, the Government is correct that Defendant's Sixth Amendment arguments are misplaced for three reasons. *See* Dkt. No 170 at 17-18. First, defense counsel did not raise a Sixth Amendment objection at trial. *See id.* Second, the Confrontation Clause places limits on the admissibility of "[t]estimonial statements of witnesses absent from trial." *Crawford v.*

*Washington*, 541 U.S. 36, 59 (2004). A Confrontation Clause challenge "can succeed only if [the] statements came into evidence for their truth." *See Smith v. Arizona*, 602 U.S. 779, 792 (2024). As the Government only offered the text messages for their effect on Lynn Baker, the Confrontation Clause as inapplicable. *See id.* at 793 ("[T]he [Confrontation] Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted'") (quoting *Crawford*, 541 U.S. at 60, n.9). And third, even if the text messages were "testimonial statements," Defendant had the opportunity to, and did, cross-examine Lynn Baker at trial. *See* Dkt. No. 163-2 at 654-706. The text messages were not statements of Bill Baker, and therefore, Bill Baker was not an absent witness whom Defendant had the right to confront. *See* Dkt. No. 170 at 18.

***2. The Trial Schedule***

Defendant argues that the Court's "efforts to maintain the trial schedule interfered with [his] ability to adequately prepare and created time-pressure for the jury." Dkt. No. 163-6 at 19-21. Specifically, Defendant takes issues with: (1) the amount of time his attorney had to prepare for trial; (2) the manner in which the Court handled Defendant's disagreements with his attorney's representation mid-trial; and (3) the Court's willingness to accommodate the personal obligations of some jurors. *See id.* The Government contends that Defendant had a generous amount of time to prepare for trial and has not demonstrated the requisite prejudice to succeed on his claim that the trial was rushed. *See* Dkt. No. 170 at 18-19.

As the Government notes, nearly fifteen months elapsed between indictment and trial in this matter. *See* Dkt. No. 170 at 18. Initially, a trial date of January 14, 2025 was scheduled. *See* Dkt. No. 34. On November 19, 2024, after Defendant filed a letter requesting a representation hearing, the Court relieved Defendant's first attorney. *See* Dkt. Nos. 36, 37. The same day, the

Court appointed attorney Scott Iseman, Esq. ("Mr. Iseman") to represent Defendant. *See* Dkt. No. 39. Recognizing the need for Defendant's new attorney to prepare for trial, the Court adjourned the trial to March 31, 2025. *See* Dkt. Nos. 42, 43. During the representation hearing on November 19, 2024, Defendant's first attorney stated that Defendant's "new counsel [may] feel compelled to move to continue" the trial date. Dkt. No. 163-5 at 10:2-6. But Mr. Iseman did not request a continuance or raise any concerns regarding the new trial date. Defendant's first attorney's opinion that a new attorney may request more time to prepare is not proof that additional time was in fact necessary. In sum, the Court granted Defendant's late request for new counsel and set a trial date more than four months out. Defendant has failed to demonstrate how the Court's indulgence of his requests for a new attorney and an adjournment caused any manifest injustice.

As for the trial schedule itself, the Defendant was not prejudiced. Judges are granted "wide discretion . . . in the administration of a trial." *United States v. Raniere*, No. 18-CR-204, 2023 WL 3092991, *4 (E.D.N.Y. Apr. 26, 2023), *aff'd*, No. 24-1285, 2025 WL 3001634 (2d Cir. Oct. 27, 2025).[6]

At the final pretrial conference, the parties stated that they expected the trial to last seven days. *See* Text Minute Entry, dated Mar. 20, 2025. The trial lasted eight days—approximately as

[6] In the context of civil cases, district courts have observed that "'[t]here is a long line of cases making clear the authority of district judges to impose reasonable time limitations on trials[.]'" *Lidle v. Cirrus Design Corp.*, 278 F.R.D. 325, 331 (S.D.N.Y. 2011), *aff'd*, 505 Fed. Appx. 72 (2d Cir. 2012) (citation omitted). Moreover, a party moving for a new trial under Federal Rule of Civil Procedure 59(a), based upon allegations that the time limitations set by a district court were too short, must "come forward with an offer of proof showing how its presentation w[as] . . . curtailed [by the time limitation] and must demonstrate prejudice." *Id.* (quoting *Evans v. Port Auth. of N.Y. & N.J.*, 246 F. Supp. 2d 343, 351 (S.D.N.Y. 2003) (internal quotation marks omitted). This Court does not suggest that same rules necessarily apply in the context of a criminal trial. However, under the applicable standard, Defendant still must demonstrate "manifest injustice" to succeed here. *Aguiar*, 737 F.3d at 264.

long as the Court and the parties anticipated. *See* Dkt. No. 95. Indeed, the only reason that the trial continued into an eighth day was because the seventh day of trial was adjourned due to Defendant's failure to appear. *See* Dkt. No. 163-2 at 1465:3-1494:12.

During the third day of trial, the Court held an *ex parte* conference to hear Defendant's complaints regarding Mr. Iseman's representation. *See* Dkt. No. 163-2 at 598:1-606:24. In sum, Defendant claimed that there were certain documents (which were from outside the time period charged in the Indictment) that Mr. Iseman had not used during his cross-examination of Mayes. *See id.* After hearing from Mr. Iseman and Defendant, the Court observed that Mr. Iseman reviewed the documents at issue and decided that it would not be in Defendant's best interests to use them. *See id.* at 605:1-9. The Court also noted as follows:

> I just want to say that from the Court's perspective, Mr. Iseman's cross-examination of Mr. Mayes was effective . . . . I didn't see anything defective in the cross of Mr. Mayes, and we're at the point now where we're several days into the trial. You have a very experienced criminal defense lawyer here who may not always do exactly what you want because he may know strategically that that might draw an objection and a ruling from me that is adverse to you. But at this point in time, the case is going to continue and it's either going to continue with a very experienced criminal defense lawyer defending you or you would have to defend yourself, which I highly recommend against.

Dkt. No. 163-2 at 601:13-602:1.

Defendant now claims that, during this conference, the Court failed to advise him of the possibility of obtaining standby counsel. *See* Dkt. No. 163-6 at 20. However, as Defendant acknowledges, *see id.* at 20 n.2, "the appointment of standby counsel is discretionary" and this Court "had no obligation to inform [Defendant] about standby counsel," *United States v. Archambault*, 740 Fed. Appx. 195, 199 (2d Cir. 2018) (summary order). The Court will not speculate regarding whether standby counsel would have been appointed in the event Defendant

elected to finish the trial *pro se*. The Court advised Defendant of his right to represent himself if he wished and, ultimately, Defendant chose to continue the trial with Mr. Iseman as his appointed counsel. There was no undue pressure exerted by this Court and no manifest injustice caused by Defendant's choice to proceed with representation.

Finally, the Court did not create "scheduling pressures" that resulted in a "rushed verdict." Dkt. No. 163-6 at 20-21. On Tuesday, April 8, 2025, after excusing the jury for a lunch recess, the Court inquired regarding how much time the parties needed to finish the proof. *See* Dkt. No. 163-2 at 1389:14-1390:22. During this discussion, the Court noted that some jurors had obligations many days later; one juror had an appointment at 4:00PM on Friday, April 11, 2025, another juror had a vacation beginning Saturday, April 12, 2025, and an alternate juror had a flight scheduled for Friday, April 11, 2025. *See id.* At the time the Court mentioned these jurors' obligations, the Government had rested, Defendant had presented his direct testimony, the Government had "a half hour more of cross[,]" and Defendant had no other witnesses to call. *Id.* at 1390:6-14. With the jurors' schedules in mind, the Court intended to reassure them that the proof would conclude shortly so that they would maintain focus on the remaining testimony and upcoming summations. *See id.* at 1390:19-22. The trial was coming towards an end and the Court simply wished to inform the jurors that everything was going according to schedule. Defendant's baseless insinuation that the Court "press[ed] the trial forward" by ensuring the jurors were kept abreast of the trial schedule falls far short of demonstrating manifest injustice. Dkt. No. 163-6 at 20.

In sum, this Court's respect for the timely administration of justice, the rights of the accused to a speedy trial, and maintaining an orderly trial schedule did not result in any manifest injustice. The jury convicted the Defendant on twenty-four counts after hearing overwhelming

evidence which proved Defendant's guilt beyond a reasonable doubt. Defendant is not entitled to a new trial merely because he is dissatisfied with the outcome.

### *3. Ineffective Assistance of Counsel*

Defendant next contends that he is entitled to a new trial on the basis of ineffective assistance of counsel. *See* Dkt. No. 163-6 at 21-22. After setting forth the appropriate legal standard, Defendant asks the Court to consider the myriad of allegations and assertions he makes in numerous *pro se* filings submitted before his counseled briefing was filed. *See id.* Defendant asserts that his *pro se* letters demonstrate that "his trial counsel was unprepared," "did not conduct a proper and sufficient pre-trial investigation," "rejected [Defendant's] request that he ask for a continuance of the trial date so they could sufficiently prepare for trial," "was unresponsive to [Defendant's] requests to call witnesses and introduce evidence," "and was generally ineffective in his questioning of witnesses and presentation of evidence[.]" *Id.* (citing Dkt. Nos. 160, 161).

In opposition, the Government argues that the Court should not consider Defendant's claim for ineffective assistance of counsel because Defendant relies solely on his *pro se* filings and, as such, attempts to improperly engage in hybrid representation and avoid the Court's page limitation rules. *See* Dkt. No. 170 at 20. The Court agrees.

"The Sixth Amendment gives criminal defendants the right to representation by counsel or, should they so choose, to represent themselves." *United States v. Hage*, 74 F.4th 90, 93 (2d Cir. 2023) (citing *Faretta v. California*, 422 U.S. 806, 834-35 (1975)). "A defendant has, however, no right to 'hybrid' representation in which he is represented by counsel but supplements his lawyer's work with selected *pro se* submissions." *Id.* (quoting *United States v. Rivernider*, 828 F.3d 91, 108 (2d Cir. 2016)) (footnote omitted). "Although a court may, in its discretion, allow *pro se* appearances from a counseled defendant, . . . the defendant cannot switch between *pro se*

and counseled modes at will, because the two rights 'cannot be . . . exercised at the same time[.]'" *Id.* (internal citations omitted).

Such hybrid representation is "unnecessary[,]" "unwise[,]" and "disfavored." *Id.* at 94. Indeed, as the Second Circuit has explained, "a *pro se* supplemental brief permits a counseled defendant to make an end run around . . . procedural rules." *Id.* "Even the liberality we extend to *pro se* litigants does not license failure 'to comply with relevant rules of procedural and substantive law.'" *Id.* (quoting *Faretta*, 422 U.S. at 834 n.46).

This Court has been exceedingly patient in entertaining Defendant's constant dissatisfaction with his assigned counsel. As discussed, before trial, the Court relieved plaintiff's first attorney, a seasoned criminal defense attorney from the Office of the Federal Public Defender for the Northern District of New York. *See* Dkt. No. 38. Defendant was then appointed another skilled attorney, selected from the Criminal Justice Act panel, who represented Defendant at trial. *See* Dkt. No. 39. After his conviction, Defendant continued to request new attorneys. On June 16, 2025, Defendant was appointed his third attorney, on October 8, 2025, Defendant was appointed his fourth attorney, and on January 23, 2026, Defendant was appointed his fifth attorney. *See* Dkt. Nos. 104, 105, 122, 123, 135, 136. Moreover, the Court has repeatedly told Defendant that his filings must be made by counsel. *See e.g.*, Dkt. No. 119 ("All submissions to the Court should be made through counsel"). Indeed, at a December 4, 2025 status conference, this Court directed Defendant (specifically with respect to any forthcoming motion for a new trial) "not to submit any more filings to the Court while he has counsel—all submissions must come through counsel." Text Minute Entry, dated Dec. 4, 2025.

As such, the Court finds that Defendant's arguments regarding ineffective assistance of counsel are not properly raised and will not be considered.

Regardless, even if the Court were to consider the merits of an ineffective assistance of counsel claim, such claim would fail. "To prevail on a claim for ineffective assistance of counsel," a defendant "must satisfy *Strickland*'s two-part test, which requires demonstrating (1) that counsel's performance was deficient, *i.e.*, 'that counsel's representation fell below an objective standard of reasonableness,' and (2) that counsel's deficient performance prejudiced the defense, meaning that 'counsel's errors were so serious as to deprive the defendant of a fair trial.'" *United States v. Choudhry*, 330 F. Supp. 3d 815, 844 (E.D.N.Y. 2018), *aff'd*, 813 Fed. Appx. 4 (2d Cir. 2020) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "A claim for ineffective assistance of counsel 'must be rejected if the defendant fails to meet either the performance prong or the prejudice prong.'" *Id.* at 845 (quoting *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011)).

In the first prong of the *Strickland* analysis, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, . . . viewing the actions in light of the law and circumstances confronting counsel at the time." *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citation and internal quotation marks omitted). "When considering the first prong, [courts] strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, . . . a presumption that is overcome only through a showing that counsel failed to act reasonably considering all of the circumstances." *Jackson v. Conway*, 763 F.3d 115, 152 (2d Cir. 2014) (citation and internal quotation marks omitted) (cleaned up). "'[A] court reviewing a claim for ineffective assistance of counsel is not permitted to "use hindsight to second guess [counsel's] strategy choices."'" *United States v. Derounian*, No. 16-CR-00412, 2024 WL 3623522, *22 n.23 (E.D.N.Y. Aug. 1, 2024) (quoting *Baran v. United States*, 160 F. Supp. 3d

591, 596 (S.D.N.Y. 2016)). To satisfy the second prong of the *Strickland* analysis, "the defendant 'must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *United States v. Robinson*, No. 16-CR-00545, 2021 WL 62076, *23 (S.D.N.Y. Jan. 6, 2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

With regard to Defendant's assertion that his trial counsel was unprepared, failed to ask for a continuance of the trial date, and was generally ineffective in his questioning of witnesses and presentation of evidence, the trial record belies any insinuation that Defendant's trial counsel was deficient. For example, as discussed, when Defendant questioned his counsel's performance mid-trial, this Court stated multiple times that Mr. Iseman's questioning of a key witness was effective. *See* Dkt. No. 163-2 at 601:13-602:1, 603:3-4, 605:7-9.

Defendant's argument that his trial counsel was ineffective for failing to call witnesses or introduce certain evidence is equally without merit. As discussed, defense counsel made a thoughtful strategic decision regarding what evidence to present. Defendant's disagreement with trial strategy is not a basis to find ineffective assistance. Indeed, "'[t]he decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.'" *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (citation omitted). "[C]ounsel's decision as to whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *Id.* (citation and internal quotation marks omitted).

In sum, Defendant's ineffective assistance claim would not satisfy the first *Strickland* prong, let alone demonstrate a reasonable probability that the outcome at trial would have been

any different. Thus, even if the Court considered the claim, given the strong presumption of adequate assistance, the Court could not find, on the present record, that Defendant's trial counsel's performance was so deficient as to cause manifest injustice.

***4. The Verdict***

Finally, Defendant argues that the jury's verdict "essentially criminalizes a business failure." Dkt. No. 163-6 at 22-23. This was Defendant's theory throughout trial; as the Government correctly notes, during summation, Defendant's "counsel admonished the jurors, over and again, that [Defendant] was just a hapless businessman." Dkt. No. 170 at 21 (citing to the record). However, the jury, after hearing all of the evidence, determined that the Government proved Defendant's guilt beyond a reasonable doubt on twenty-four counts. Defendant's displeasure that the jury did not accept his explanation is not evidence of manifest injustice.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motions for judgment of acquittal and for a new trial (Dkt. No. 163) are **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 29, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge